William Evers v. Commissioner.
Evers v. Commissioner
Docket No. 81689.
United States Tax Court
T.C. Memo 1961-179; 1961 Tax Ct. Memo LEXIS 170; 20 T.C.M. (CCH) 906; T.C.M. (RIA) 61179; June 16, 1961
*170 Held, the amount of $2,200 received by petitioner in 1953 from the University of Minnesota was includible in his gross income for that year as compensation for services rendered by him to the University. Abraham J. Levy, Esq., for the petitioner. Albert Squire, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency of $654.59 in the petitioner's income tax for 1953. The sole issue is whether the amount of $2,200 received by petitioner in 1953 from the University of Minnesota to support a research project was a gift within the meaning of section 22(b)(3) of the Internal Revenue Code of 1939[1] and therefore excludable from gross income. *171 Findings of Fact Some of the facts have been stipulated and they are hereby included by this reference. William Evers, hereinafter called petitioner, is a resident of Philadelphia, Pennsylvania. He filed his income tax return for the year 1953 with the district director of internal revenue at St. Paul, Minnesota. In 1945 the petitioner received the degree of Doctor of Medicine from the Federal Institute of Medicine, Samarkand, Uzbeck Republic, Union of Soviet Socialist Republics. In October 1951 he entered the medical school of the University of Minnesota, Minneapolis, Minnesota, as a candidate for the degree of Master of Science in Anesthesiology. Candidates for this degree were required, in addition to taking certain courses, to submit a thesis based upon their original research. Upon entering the medical school the petitioner received an appointment as a Medical Fellow in the Division of Anesthesiology, which was in the Department of Surgery. Petitioner's principal duties as a Medical Fellow were to administer anesthetics to the school's hospital patients, and to attend them before and after giving them anesthetics. He was paid at the rate of $1,800 per year for these *172 services by the University, and in 1953 he received $1,805.31 for this work. Sometime in 1952 or early 1953 the regents of the University of Minnesota applied to the United States Public Health Service for a research grant for a research project entitled, "The influence of alterations in carbon dioxide concentration during anesthesia studies utilizing a portable mass spectrometer. The application stated that the principal investigator in this research project would be Richard L. Varco, Professor of Surgery in the University's Department of Surgery. The United States Public Health Service approved this application and paid to the University the amount it had applied for, designating the payment as Research Grant G3388. On May 20, 1953 the University applied for additional funds in the amount of $9,996 for this same project for the period from December 1, 1953 through November 30, 1954. The application form executed by the University on May 20, 1953 provided on its face that "funds granted as a result of this request are to be expended for the purposes set forth herein;" and on the reverse side there were listed, as budget proposals, the following items: Medical Fellow - Dr. William Evers
$3,000.00
Laboratory technician (1/2 time)
1,600.00
Physicist (1/2 time)
1,500.00
Secretary (1/4 time)
600.00
Mechanic and part time help
500.00
Workmen's Compensation Ins.
55.80
Supplies
2,000.00
Miscellaneous
740.20
$9,996.00
*173 The application for additional funds was approved on July 22, 1953 in a letter to Varco which stated, in part, that "It is important for you to note that under Public Health Service policy, a grantee is not required to follow the specific details of the project submitted for review, particularly if he finds promising leads that in his opinion are likely to be more productive than the project proposal itself." Petitioner was informed by the head of the Department of Anesthesiology that he would be given a grant of about $2,000 for 1953. The grant was to come from the funds in Research Grant G3388. At this time petitioner had completed a part of his studies and he was told by the head of the Department of Anesthesiology to select a subject for his research and to submit it for approval to the proper University authority. Petitioner selected the subject "Reflex Changes in Heart Rate and Rhythm During Laryngeal Manipulation. Evaluation of Incidence as Related to the Use of Pentothal-Curare, Pentothal-Flaxedil and Topical Cocaine in Clinical Anesthesia." In April 1954 the petitioner submitted his thesis, based on this original research, to the University in partial fulfillment of the *174 requirements for his degree, and on July 15, 1954 the University awarded petitioner the degree of Master of Science in Anesthesiology. During 1953 the petitioner, in addition to his studies and his work on his original research project, performed at various times the manual task of filling the mass spectrometer, a "delicate electronic machine," with liquid air in order to maintain a vacuum in it. Petitioner sometimes did this twice a week and at times even more often. He also used the mass spectrometer during this period in connection with his research. During the year 1953 the University of Minnesota paid to petitioner $2,200 out of the funds it had received from the United States Public Health Service under Research Grant G3388. This amount, as well as the amount of $1,805.31 which petitioner earned in 1953 as a Medical Fellow, was combined by the University in the semimonthly check received by petitioner. The University withheld in taxes the amount of $661 from the total of $4,005.31 paid to petitioner in 1953. Petitioner excluded from gross income in his 1953 income tax return the $2,200 received by him in 1953 from the University, and he attached a letter, dated January 26, 1954, from *175 the University's assistant chief accountant explaining that petitioner received "earnings" of $4,005.31 from the University in 1953 and that $2,200 of the total earnings came out of the research grant funds. On May 8, 1958 Varco wrote to petitioner, as follows: Of course, I am happy to provide you with my understanding of how you obtained your salary during your year with the mass-spectrometer project. Whereas, in my letter of August 7, 1956, I did indicate that your services "in the care and use of this mass-spectrometer" had been paid from this research grant. I wish to indicate at this time that the preponderant bulk of your stipend unquestionably came because of your use of this instrument and I particularly recall that the major servicing of this machine was quite independent of anything that you did and rather arose from help provided by people in the Department of Physics. Respondent included the amount of $2,200 in petitioner's income for 1953 as compensation for services rendered. Opinion It is petitioner's contention that the $2,200 received by him in 1953 to engage in his research project was a gift from the University and, therefore, excludable from gross income. *176 Section 22(b)(3). [2] To support this contention, petitioner emphasizes that he received the grant to carry on his own independent research so that he could qualify for his advanced degree and that he did not solicit the grant; that he rendered no service to the University in return for the grant; and that the University received no benefit from the petitioner's research conducted under the grant. The question is basically one of fact. In Commissioner v. Duberstein 363 U.S. 278, the Court outlined some of the applicable principles as follows: * * * "[where] the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it." Robertson v. United States, 343 U.S. 711, 714 * * *. A gift in the statutory sense * * * proceeds from a "detached and disinterested generosity," Commissioner v. LoBue, 351 U.S. 243, 246 *177 * * *; "out of affection, respect, admiration, charity or like impulses." Robertson v. United States, supra, at 714. And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's "intention." Bogardus v. Commissioner, 302 U.S. 34, 43 * * *. [Footnote 7 omitted] It is admitted here that $2,200 which petitioner received was paid to petitioner from the funds the University received from Grant G3388. As indicated in Commissioner v. Duberstein, supra, the "critical consideration" is the transferor's intention. No one from the University testified in this case. We only have the testimony of petitioner that the University gave him a "Research Grant in order to enable me to proceed with my project to obtain my Master's degree * * *." In reply to leading questions of his counsel he stated no particular services to the University were required and he was free to select any subject, spend any amount of time in research that he wished, or perform no research services. It is upon these and other similar fragments of petitioner's testimony that he bases his argument that the $2,200 was a gift. *178 The probative value of such bits of testimony vanish when elsewhere in petitioner's testimony we find contradictory statements to the effect that he was required to select and develop the plan of research and "submit it for approval" and he was required to consult with his research supervisor as to "the progress of my project." We think it is evident that the University intended the grant of $2,200 to petitioner as compensation for services to be rendered, and that the grant was not made from any "detached and disinterested generosity" on its part. The University obtained funds in 1953 from the United States Public Health Service for a research project on the influence of alterations in carbon dioxide concentration during anesthesia studies utilizing a portable mass spectrometer. (Research Grant G3388.) In receiving the research grant, the University explicitly agreed that the funds were to be used only for this purpose, although some leeway was allowed if the University found promising leads which were likely to be more productive than the project originally proposed. It appears that petitioner during 1953 performed at various times the task of filling the mass spectrometer, which *179 petitioner described as a "delicate electronic machine," with liquid air in order to maintain a vacuum, and that he also used the mass spectrometer in his own research. Varco, who was professor of surgery in the University's Department of Surgery and the principal investigator under the research grant received by the University, wrote to petitioner in 1958 that "my understanding of how you obtained your salary during your year with the mass-spectrometer project" was "that the preponderant bulk of your stipend unquestionably came because of your use of this instrument." It is also significant, we think, in showing the University's intention in making the grant to the petitioner in 1953, that the University regarded the $2,200 as "earnings" of the petitioner in that year, from which the University withheld Federal income taxes. See Ephraim Banks, 17 T.C. 1386. Also, it appears that when the University made a second application for funds in May 1953 from the United States Public Health Service under the same project, the University on its application form allocated $3,000 to petitioner out of a requested grant of about $10,000. While this second requested grant was for *180 the period December 1, 1953 through November 30, 1954, we think it serves to indicate the relative importance to the University of petitioner's services in connection with the entire mass spectrometer project. There can be no doubt that the University considered petitioner as a part of the research team that was to perform the services under the obligation of the grant and the payment of grant funds were for services rendered. It may be true that the research grant of $2,200 in 1953 (together with the $1,805.31 he received from the University as a Medical Fellow) would pay for petitioner's expenses in that year, and, in that sense, enable him to carry on his original research in order to obtain his Master's Degree, and the same research might enable him to write the required thesis, but this certainly is not inconsistent with the fact that the grant itself was for his services under the University's Research Project G3388 involving the use of the mass spectrometer. We might add that the grant to petitioner was for his use of the instrument in 1953, not for its servicing, which was performed by other technically trained personnel. Therefore, there is no significance in petitioner's *181 testimony that it was "entirely impossible for a person with as little knowledge about electronics as I have to service that machine." We hold that the amount of $2,200 is includable in petitioner's income for 1953 as compensation for services performed by him. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.↩
2. This controversy arose under the provisions of the Internal Revenue Code of 1939. Section 117 of the 1954 Code contains statutory provisions for the exclusion from gross income of amounts received from scholarship and fellowship grants. See also Chander P. Bhalla, 35 T.C. - (Oct. 7, 1960).↩